UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

04 11194 RWZ

| | |
|---|---|
| THOMAS R. SUTTILL, JR., D/B/A, FRAMINGHAM SHELL, ) ) ) ) Plaintiff ) ) v. ) ) MOTIVA ENTERPRISES, LLC AND EQUIVA SERVICES, LLC ) ) ) Defendants ) ) | CIVIL ACTION NO.: |

**MEMORANDUM IN SUPPORT OF
THE PLAINTIFF'S MOTION FOR A
PRELIMINARY INJUNCTION**

I.   INTRODUCTION

The defendants, in direct violation of the Petroleum Marketing Practices Act, have wrongfully terminated Thomas Suttill d/b/a Framingham Shell's franchise agreements and have failed to comply with the notice requirements set forth under 15 U.S.C. § 2804. Specifically, there were no grounds for the termination of the franchise agreements, and no written notice of termination was ever provided to Mr. Suttill, nor was Mr. Suttill notified of the decision to terminate his franchise until just days prior to his removal from the Framingham Shell station by the defendants. In light of the defendants' total disregard for the notice of termination requirements set forth under 15 U.S.C. § 2804, Mr. Suttill is entitled to injunctive relief reinstating his franchise agreements and hereby seeks an order from this Court re-conveying possession and control of the Framingham Shell station to Mr. Suttill.

II.  FACTS[1]

Mr. Suttill is an individual who currently resides in Holliston, Massachusetts. He had never previously owned or operated a business until he entered into a set of franchise agreements with the defendants for the lease and operation of the Shell-branded station known as "Framingham Shell" located at 480 Franklin Street, Framingham, Massachusetts ("the Premises"). Prior to entering into the franchise agreements, he had worked as a mechanic at the Premises until he eventually realized his goal of operating his own business.

At the opposite end of the spectrum, the defendant, Motiva Enterprises, LLC, ("Motiva") is owned by Shell Oil Company and Saudi Aramco. Motiva and Equilon Enterprises jointly own the co-defendant, Equiva Services, LLC ("Equiva"). Motiva and its sister company, Shell Oil Products U.S., together are the number one United States gasoline retailer. Motiva operates four refineries with a total capacity of 860,000 barrels a day, and it sells fuel at 13,000 Shell and Texaco branded stations.

Mr. Suttill, as franchisee, and the defendants, as franchisor, entered into a set of franchise agreements governed by the Petroleum Marketing Practices Act, 15 U.S.C. § 2801, et. seq. Specifically, the parties entered into: (1) a Retail Facility Lease of the Premises to Mr. Suttill and (2) a Retail Sales Agreement[2] for the use of the Shell trademark by Mr. Suttill, the supply of motor fuel by the defendants to be sold by Mr. Suttill under the Shell trademark, and the lease of the Premises to Mr. Suttill at which the

---

[1] These facts are verified by the Verified Complaint signed by Thomas Suttill.
[2] Hereinafter both agreements are collectively referred to as "the Franchise Agreements." A true and accurate copy of the Retail Sales Agreement is attached hereto as Exhibit A. A true and accurate copy of the Retail Facility Lease is attached hereto as Exhibit B.

2

motor fuel is sold. The Franchise Agreements run from December 1, 2002 through December 31, 2005.

The Premises are also subject to an underlying lease between the defendants and a third party. Although the underlying lease with the third party property owner is purportedly scheduled to expire on December 31, 2004, Mr. Suttill can continue to operate his business for the remainder of the lease term as long as the property owner renews the underlying lease agreement with the defendants.

After September 11, 2001, Mr. Suttill's business began to decline and he eventually decided to sell his interest in the Premises to a third party as authorized by the Franchise Agreements. On or about January, 2004, Mr. Suttill began negotiating an agreement for the sale of his entire interest in the Premises, including the Franchise Agreements, to Michael Forman, the proprietor of Absolute Car Care in Framingham, Massachusetts. Mr. Suttill provided the defendants with written notice of his intent to transfer his interest in the Premises.

After Mr. Suttill notified the defendants of his intention to sell his interest in the premises, the defendants wrongfully and unilaterally altered the gasoline delivery schedule to the Premises, delivering 11,800 gallons to Mr. Suttill as frequently as two times per week, thereby doubling the amount of gasoline deliveries to the Premises. Further, the defendants altered their billing practices for said gasoline deliveries, demanding immediate payment in full for each delivery from Mr. Suttill before he was able to re-sell the gasoline to consumers. When Mr. Suttill raised an issue with the

defendants regarding this sudden change in gasoline delivery practices, he was told by the defendants' agent that he had to "learn to deal with it."[3]

During this period of wrongful conduct by the defendants, Mr. Suttill continued to negotiate the sale of his interest in the Premises to Mr. Forman. Mr. Suttill and Mr. Forman had reached an agreement regarding the purchase price for Mr. Suttill's interest in the Premises in February, 2004. Upon reaching an agreement, Mr. Suttill contacted the defendants, by and through their authorized representative, Robert Resnick, to inform them that Mr. Suttill had a deal in place to sell his interest in the Premises to Mr. Forman and was providing the defendants with an opportunity to exercise the right of first refusal.

Subsequently, on or about February 19, 2004, Mr. Resnick informed Mr. Suttill that the underlying lease between the defendants and the property owner, scheduled to expire in December, 2004, would not be renewed. Mr. Resnick further indicated that he would communicate these facts directly to Mr. Forman. Upon hearing this information from Mr. Resnick, Mr. Suttill responded that he would be unable to sell his business to anyone at all if the underlying lease was not renewed. Mr. Resnick responded to Mr. Suttill's concerns by orally notifying Mr. Suttill that he would be "terminated" the following day. No written notice of termination of the Franchise Agreements was ever provided to Mr. Suttill, nor was Mr. Suttill provided with any explanation for the decision to terminate his franchise.

Just days after Mr. Resnick orally notified Mr. Suttill that he would be

---

[3] This billing practice for gasoline deliveries has already been the source of litigation for other Shell franchisees, thereby resulting in an order from this Court (Zobel, J.) in LaGasse v. Shell Oil Products, docket number CV-11247-RWZ, prohibiting said billing practices.

4

"terminated", Mr. Suttill was ordered by the defendants to immediately leave the Premises and to remove all equipment and inventory therefrom. The defendants changed the locks, thereby preventing Mr. Suttill from re-entering the Premises.

On or about February 24, 2004, the defendants replaced Mr. Suttill with a third party, Tony Alzimmer, who began operating the Premises. It is Mr. Suttill's understanding that Mr. Alzimmer operates approximately fifty other gas stations for the defendants. Mr. Alzimmer informed Mr. Suttill that the defendants had never informed him that the underlying lease that expires in December, 2004 would not be renewed. Mr. Alzimmer subsequently offered to hire all of Mr. Suttill's employees, informing them that the underlying lease between the defendants and the property owner was, in fact, going to be renewed at the end of the lease term by the defendants.

Mr. Alzimmer informed Mr. Suttill that he would have paid Mr. Suttill for his inventory if the defendants had not ordered Mr. Suttill to remove said inventory from the Premises. However, neither Mr. Alzimmer nor the defendants have offered anything to Mr. Suttill to compensate him for the taking of Mr. Suttill's interest in the Premises, including the taking of his interest in the Franchise Agreements. Further, the defendants currently owe Mr. Suttill approximately $14,000.00 for the sale of gasoline to Mr. Suttill's customers, which is past due.

Without his business, including the ability to transfer his interest in that business to a new owner, Mr. Suttill now faces personal bankruptcy.[4] Further, his reputation as a businessman in the community has been injured as he was unable to consummate the sale to Mr. Forman due to the defendants' deceitful acts. Additionally, the good

---

[4] Mr. Suttill obtained a small business loan for Framingham Shell when he originally purchased his interest in the Premises from the prior franchisee. Now that the defendants have wrongfully taken possession and control over the Premises from Mr. Suttill, the bank has demanded full payment of Mr. Suttill's loan.

5

will generated by Mr. Suttill in operating Framingham Shell has been wrongfully stolen from him by the defendants.[5] Accordingly, Mr. Suttill seeks a preliminary injunction to reinstate the Franchise Agreements and re-convey possession and control over Premises to him.

III.   ARGUMENT

The defendants wrongfully terminated the Franchise Agreements without cause and they failed to provide Mr. Suttill with any written notice of termination. The defendants' actions are in direct violation of the Petroleum Marketing Practices Act, which was enacted to prevent petroleum franchisors from engaging in the very same unfair and oppressive tactics that the defendants have engaged in as set forth herein. In light of the foregoing, Mr. Suttill is entitled to injunctive relief enjoining the defendants from terminating the Franchise Agreements and ordering the re-transfer of possession and control of the Premises to Mr. Suttill.

   A.   The Petroleum Marketing Practices Act was Enacted by Congress to Prevent Petroleum Franchisors from Engaging in Widespread Abuse of Franchisees

The Franchise Agreements in this case are governed by the PMPA, 15 U.S.C. § 2801 et seq.[6] The PMPA was enacted by Congress in response to the "David versus Goliath aspect of the relationship between the small retailer franchisee and the giant petroleum company franchisor." Darling v. Mobil Oil Corp., 864 F.2d 981, 982 (2d Cir.

---

[5] Refer to the attached newspaper article lauding Mr. Suttill's operation of Framingham Shell at Exhibit C.
[6] Refer to the Franchise Agreements generally and 15 U.S.C. § 2801(1)(A) defining the term "franchise" as any contract between a distributor or refiner and a retailer under which a distributor authorizes or permits a retailer to use, in connection with the sale of motor fuel, a trademark which is owned by refiner which supplies motor fuel to the distributor which authorizes or permits such use. This is the precise subject matter of the Franchise Agreements.

1989). In enacting the PMPA, Congress has made an attempt at "making that relationship more equal." Id.

The PMPA is intended to protect "franchisees from arbitrary or discriminatory termination or non-renewal of their franchises.'" Greco v. Mobil Oil Corp., 597 F. Supp. 468, 471 (1984), quoting S. Rep. No. 95-731, 95th Cong., 2d Sess. 15, reprinted in 1978 U.S. Code Cong. & Ad. News 873, 874. "Such protection was needed to curtail the widespread abuse to petroleum franchisors of their ability to terminate franchises." Mobil Oil Corp. v. Karbowski, 879 F.2d 1052, 1055 (2d Cir. 1989). "This goal is balanced against 'the legitimate needs of a franchisor to be able to terminate a franchise…based upon certain acts of the franchisee.'" Id. (quoting Senate Report No. 731 at 877). The result of this balancing is that petroleum companies may properly terminate franchises only for certain enumerated reasons. Zipper v. Sun Company, Inc., 947 F. Supp. 62, 67 (1996), citing 15 U.S.C. §2802(a). Even if there is a valid ground for termination, such action may be taken only when the notification requirements of the PMPA are met (emphasis added). Id., citing 15 U.S.C. §§ 2802(b)(1)(A) and 2804.

B.   Failure of the Petroleum Franchisor to Strictly Comply with the Notice Requirements Under 15 U.S.C § 2804 is Grounds for Injunctive Relief Enjoining Termination of Franchise

"When reviewing a question under the PMPA, the court is guided by the principle that as a 'remedial legislation, the Act must be given a liberal construction consistent with its overriding purpose to protect franchisees.'" Greco, 597 F. Supp at 473, quoting Brach v. Amoco Oil Co., 677 F. 2d 1213, 1221 (7th Cir. 1982). Accordingly, a franchise cannot be terminated by the franchisor unless the basis for termination falls within one of

the specifically enumerated reasons contained within section 2802 of the PMPA. Even if the basis for termination is authorized under the PMPA, the franchisor must first provide notification of the termination to the franchisee in strict compliance with 15 U.S.C. § 2804. See Greco, 597 F. Supp. at 471 citing Mobil Oil Corp. v. Vachon, 580 F. Supp. 153, 159 (D.Mass.1983); Davy v. Murphy Oil, 488 F. Supp. 1013, 1016 (W.D. Mich. 1980); Blankenship v. Atlantic Richfield Co., 478 F. Supp. 1016 (D. Or. 1979); Ceraso v. Motiva Enterprises, LLC, 326 F. 3d 303, 314 (2d. Cir. 2003). Failure to comply with the notice provision, even if the defect is only a minor or a technical one, is grounds to enjoin the termination of the franchise relationship. See Greco, supra, citing Davy v. Murphy Oil, supra at 1016.

Under section 2804, notice of termination or nonrenewal must be given no less than ninety (90) days before the effective date. See 15 U.S.C. § 2804(a)(2). Section 2804(c) provides that the notice shall be in writing, sent by certified mail or personal delivery and further provides that the notice shall contain:

(a) a statement of the intention to terminate the franchise relationship, together with reasons therefor;

(b) the date on which such termination takes effect; and

(c) the summary statement prepared in accordance with subsection (d) of section 2804.

See 15 U.S.C. § 2804.

The franchisor has the burden of showing that the termination was justified and properly executed. Ceraso, supra at 314, citing 15 U.S.C. § 2805(c).

"The PMPA requires that, if a franchisor fails to comply with the notification

requirements of sections 2802(b)(1)(A) and 2804, and the franchisee brings an action based on such failure, the court must grant such equitable relief as is necessary to remedy the effects of such failure." Bent v. Leemon Oil Co., Inc., 849 F. Supp. 1180, 1184 (1994)(Injunctive relief ordered restoring plaintiff franchisee to position she was in prior to defendant franchisor's attempts to evict franchisee and terminate franchise agreements when franchisor made no effort to comply with notice requirements of PMPA); see also Hanes v. Mid-America Petroleum, Inc., 577 F. Supp 637, 647-48 (W.D. Mo. 1983), citing Clark v. Mobil Oil Corp., 496 F. Supp. 132, 134 (E.D. Mo. 1980), aff'd 652 F. 2d 2 (8th Cir. 1981)(Franchise reinstated where defendant franchisor failed to provide written notice of termination until after terminating franchise; whether reasons for termination were permitted under PMPA was irrelevant as the notice requirement was not met).

In this case, there was not just a technical defect in the notice of termination. No written notice was ever provided, and the ninety-day notification period was arbitrarily reduced to just days before the defendants forced Mr. Suttill to leave the Premises. Moreover, there were absolutely no grounds to terminate the Franchise Agreements. Since the Court must enjoin the termination of a franchise agreement for even mere technical defects under 15 U.S.C. 2802(b)(1)(A) and 2804, Mr. Suttill is entitled to injunctive relief.

C.  Congress Lessened Standard for Obtaining Injunctive Relief Under PMPA to Protect Franchisees

In its attempt to level the playing field, Congress has "relaxed" the standard for franchisees to obtain a preliminary injunction under the PMPA. Greco, 597 F. Supp at 472. First of all, no showing of irreparable harm is required. Mobil Oil Corp. v. Vachon,

9

580 F. Supp. at 159.[7] Further, a franchisee need not show a "probability" of success on the merits, but only that there is "<u>some reasonable chance</u>" of success on the merits (emphasis added). Id. citing Mobil Oil Corp v. Vachon, supra at 156; Saad v. Shell Oil Co., 460 F. Supp. 114, 116 (E.D. Mich. 1978). The "balance of hardships" must be in the franchisee's favor. Id. Invariably, the balance of hardships weigh heavily in favor of granting the injunction to the franchisee. Id., citing Mobil Oil Corp. v. Vachon, supra at 159 (Plaintiffs faced bankruptcy as a result of termination of franchise while continuation of franchise would result in no significant change to the defendant petroleum companies); Wojchiechowski v. Amoco Oil Co., 483 F.Supp. 109, 112 (E.D. Wisc.1980); Gilderhus v. Amoco Oil Co., 470 F.Supp. 1302, 1306 (D. Minn. 1979).

In Greco, the defendant franchisor, Mobil, sent the plaintiff a written notice of termination of the plaintiff's franchise. The notice indicated that Mobil was not renewing the franchise because it wanted to sell the premises at issue. Greco, supra at 473. Although the notice of termination was in writing and complied with many of the requirements of the PMPA, the notice did not provide any reasons as to why Mobil wanted to sell the premises, and therefore, the Court held that a "serious question exists as to Mobil's compliance with the notice provision of the PMPA." Id. In light of these facts, the Court concluded that the plaintiff franchisee had more than a reasonable chance for success on the merits. Id. Therefore, the Court granted Greco's motion for a preliminary injunction, thereby preventing the franchisor from terminating the franchise relationship. Id. at 474.

---

[7] Although no showing of irreparable harm is required, there is an abundance of caselaw which holds that "the loss of a franchise is an irreparable harm...and thus legal remedies are inadequate." Wojciechowski v. Amoco Oil Co., 483 F. Supp. 109, 112 (1980), citing Stenberg v. Checker Oil Co., 573 F. 2d 921 (6th Cir. 1978); Milsen Co. v. Southland Corp., 454 F. 2d 363 (7th Cir. 1971).

In this case, the facts are far more egregious than in <u>Greco</u>. In total disregard of the PMPA, the defendants arbitrarily terminated the Franchise Agreements without cause and ordered Mr. Suttill to immediately vacate the Premises without delivering any written notice. Compare <u>Greco,</u> where, although the defendants complied with many of the notice requirements under the PMPA, said efforts did not strictly comply with 15 U.S.C. §2802(b)(1)(A) and 2804, and therefore, the plaintiff had "more than a reasonable chance for success on the merits." <u>Id</u>. Here, the defendants made absolutely no effort to comply with the PMPA and therefore, Mr. Suttill has far more than a reasonable chance of success on the merits. Accordingly, under <u>Greco</u> and the cases cited herein, this Court must award injunctive relief to Mr. Suttill.

IV.  CONCLUSION

As set forth herein, the defendants have wrongfully terminated Thomas Suttill d/b/a Framingham Shell's Franchise Agreements and have failed to even attempt to comply with the notice requirements set forth under the Petroleum Marketing Practices Act. In light of the defendants' absolute disregard for the law, Mr. Suttill is entitled to injunctive relief enjoining the defendants from terminating the Franchise Agreements, and hereby seeks an order from this court re-conveying possession and control of the Premises to Mr. Suttill.

THOMAS SUTTILL, JR. D/B/A
FRAMINGHAM SHELL

By Its Attorneys,

DAVIDS & SCHLESINGER, L.L.P.

_____
Ronald M. Davids
Thomas J. Schlesinger
Jennifer A. O'Brien
40 Washington Street – Suite 250
Wellesley, MA 02482
(781) 416-5055
BBO No.: 115110
BBO No.: 546226
BBO No.: 644477

Dated 5/26/04

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THOMAS R. SUTTILL, JR., D/B/A, FRAMINGHAM SHELL, )<br><br>Plaintiff )<br><br>v. )<br><br>MOTIVA ENTERPRISES, LLC AND EQUIVA SERVICES, LLC )<br><br>Defendants ) | CIVIL ACTION NO.: |

## **ORDER**

Upon finding that the defendants failed to comply with 15 U.S.C. §§ 2802 and 2804, it is hereby ORDERED and ADJUDGED that the defendants, their agents, officers, servants, and employees are hereby enjoined from terminating the Retail Facility Lease and the Retail Sales Agreement between the defendants and the plaintiff (hereinafter collectively referred to as "the Franchise Agreements") for the premises known as "Framingham Shell" located at 480 Franklin Street, Framingham, Massachusetts (hereinafter "the Premises") during the pendency of this action.

It is further ordered that the defendants must immediately transfer sole and exclusive possession, custody and control over the Premises to the plaintiff. The defendants shall pay all costs associated with the transfer of sole and exclusive possession, custody and control of the Premises to the plaintiff, including the plaintiff's reasonable moving costs, locksmith costs, storage costs, as well as all costs and attorneys fees associated with the defendants' ejectment of any and all tenants or others currently in possession, custody and/or control of the Premises.

BY _____

TITLE _____

COURT _____

Dated _____